### SPANN v. UNITED STATES.

#### (Circuit Court of Appeals, Fourth Circuit. July 2, 1918.)

#### No. 1599.

1. CRIMINAL LAW ⊗⟳1054(1)—EXCEPTIONS BELOW—ADMISSION OF EVIDENCE.

For review of admission of evidence, exception must have been taken.

2. CRIMINAL LAW ⊗⟳1043(3)—APPEAL—OBJECTION BELOW—ADMISSION OF EVIDENCE.

Objection of admission of ledger sheets, without accounting for the original memoranda, is not available in appellate court; the objection below having been merely irrelevancy and immateriality.

3. CRIMINAL LAW ⊗⟳402(1)—EVIDENCE—LEDGER SHEETS—ACCOUNTING FOR ORIGINAL MEMORANDA.

Relative to admission of bank's ledger sheets pertaining to defendant's account, offered by prosecution, it appearing the original memoranda, checks, and deposit slips had been delivered to defendant, the court properly *held* that it was impossible for the bank to produce them.

---

⊗⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. PERJURY ⬤⇒32(8)—EVIDENCE—MATERIALITY.
    `Testimony of one to whom defendant gave a mortgage that he made no
    deposit to cover check given by him to defendant, *held*, on prosecution for
    perjury for statements of defendant in supplementary proceedings, ma-
    terial, as tending to show the mortgage was fictitious.
5. CRIMINAL LAW ⬤⇒784(8)—INSTRUCTIONS—WEIGHT OF EVIDENCE.
    Instruction leaving it to the jury to determine whether positive testi-
    mony or circumstances shall prevail, according as they believe in the
    credibility of the witnesses, in view of the circumstances, *held* proper.

In Error to the District Court of the United States for the East-
ern District of South Carolina, at Charleston; Henry A. Middleton
Smith, Judge.

J. A. Spann was convicted of perjury, and brings error. Affirmed.

Stanwix G. Mayfield, of Bamberg, S. C. (Mayfield & Free, of Bam-
berg, S. C., on the brief), for plaintiff in error.

J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C. (Francis
H. Weston, U. S. Atty., of Columbia, S. C., on the brief), for the
United States.

Before PRITCHARD, KNAPP and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. The plaintiff in error, defendant in
the court below, was tried in the United States District Court for the
Eastern District of South Carolina on an indictment containing seven
counts, in each of which he was charged with the offense of per-
jury. The defendant was convicted on the first and second counts.

It appears that during the years 1915 and 1916 the defendant was
involved in financial difficulties, and certain suits were brought against
him, both in the state and United States courts. There was also
an attempt to put him in bankruptcy; but this suit was dismissed, and
he was never declared a bankrupt. Suit having been brought in the
United States District Court above mentioned by the Read Phosphate
Company, a judgment was obtained in favor of the plaintiff. This
judgment not having been paid, supplemental proceedings were had
on March 3, 1916. Defendant appeared before the United States
District Judge for that district and testified in his own behalf. The
learned judge who tried this case charged the jury both as to the law
and facts. We think he clearly stated the facts upon which the
government relied for a verdict of guilty, the material part of the
charge being as follows:

"As I said before, this is an indictment against him for perjury, for mis-
stating facts upon his examination in this court, and upon that point I will
explain to you that under the charge in the indictment and the testimony he
was examined here for the purpose of ascertaining whether or not he had
any property applicable to his creditors, exactly in the same way in which a
bankrupt is examined when he goes to get the benefit of the Bankrupt Law.
He is examined to find if he had any property, and what property he has ap-
plicable to his creditors; and I charge you on that point that the law is very
fair to both creditors as well as to an unfortunate debtor. If a man has
unfortunately contracted debts in the course of his business, the law does not
load him up with that debt; but it allows him to go into bankruptcy, to get rid
of the debts, allows him to come into court and show by process of law that

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

he has done all he could, and he is not to be harassed by process if he has no property that he can deliver up to the law; and I charge you that a man should be honest and truthful in his statements if he desires to be a bankrupt, to take advantage of the Bankrupt Law, and continue to do his part, as an active working unit in the community of which he is a member, he can do so. So, on supplemental proceedings, if he wishes to show that, although there may be judgments against him, he has no property which may be applied to it, he will not be harassed; but in each case the necessary preliminary requirement of the law is that he must tell the truth in his statement, and I charge you therefore that his examination in this court under the supplemental proceedings was that he was examined upon material and substantial matters, and his answers were to material and substantial questions, and that he was under an obligation to speak the truth, sworn obligation to speak the truth, and, if he failed to do it, why he is guilty of the crime of perjury. Then this indictment is based upon his answers under that examination upon the theory that, in his answers as to the disposition of a certain fund, he knowingly misstated the truth. A man might inadvertently misstate the truth, either from lack of memory or mistake; but to commit the crime of perjury he must knowingly misstate the truth. The testimony, which I am required by law to summarize, so as to direct your minds to the issues, is that on the 26th day of January he borrowed or attempted to borrow from one N. P. Smoak, an official of the People's Bank of Bamberg, the sum of $3,000. Mr. Smoak's testimony is that he applied for a loan from the bank. Mr. Smoak, who was acting on behalf of the bank, notified him that his financial relations with the bank were such that he could not receive any further advances from the bank. He then applied for a loan from Smoak personally, and Mr. Smoak says he agreed to lend him $3,000, to be personally lent to him upon the security of a mortgage of his stock of goods, about a few days, or a day or so, prior to the 26th of January. He says that on the 26th of January the defendant Spann came to him and produced before him a mortgage of his stock of goods to secure $3,000, the mortgage being already recorded, and thereupon he handed Spann his check for $3,000, which was not to be used by Mr. Spann, however, until some money which Smoak expected came in and should be put to Smoak's credit in the bank; the next day there appears upon the bank account of Smoak—the 27th January—a credit of $3,000, and a debit of $3,000. Now Smoak says he made no deposit there, and was not entitled to any credit of $3,000 that he knows of; that the credit for $3,000 put upon the books of the bank was made without his knowledge at all. The debit of $3,000 he admitted, and according to the testimony of Denbow was a debit from a check, was the $3,000 from the check that he had given the day before to Spann, so that you see the day after he gave the check a deposit of $3,000 was made to his credit without his knowledge, according to his testimony, and that the very same day a check for $3,000 was drawn from the bank. Smoak parted with no money; his real balance in the bank was not diminished, and there was only this crossing of checks; the check that he had given for the $3,000 to Spann was paid out of the deposit of $3,000 that he says came from he does not know where.

"Now, the theory of the government, the prosecution, is that the $3,000 credit which made that $3,000 check was the result of a deposit of seven checks which Spann drew, all dated the 26th day of January—a check to H. C. Folk for $500; check to F. W. Free for $500; check to Mayfield & Free for $1,000; check to O. A. Simmons for $150; check to Mrs. W. B. Bloom for $150; check to W. E. Spann for $250; and check to J. F. Spann for $150, which exactly total $3,000. Now, on the same day, 27th January, which shows this cross-deposit and debit in the bank, that is, that the account of N. P. Smoak shows a cross-deposit, and checks or debit, of practically the same amounts, the account of J. A. Spann shows a credit of $3,000, or a little more, and a debit of $3,000. Now, Denbow, the cashier, says that the debit of $3,000 was from these seven checks, and the theory of the government is that Spann took the $3,000 check given him by Smoak and deposited it to his own account, giving to Spann $3,000 credit. Then he drew $3,000 of checks against him, these individual checks, and deposited them again in bank to the credit of

Smoak, which was nothing according to their theory but a cross-deposit and cross-check; and if their theory be correct, and you are satisfied that was the testimony, that Smoak got credit for all these checks, as against the debit of his own check, and that Spann got the credit of Smoak's checks as against the debit of these checks, that no money had passed to anybody, Smoak never deposited any money, Spann never got any money, the holders of these checks to whom they were issued never got any money, according to the bank there was a correct balance of debit and credit on each side, but there still remained outstanding, as if valid and good, a mortgage of $3,000, the result of check and cross-debit, was that no money passed on either side, but there still remained outstanding a mortgage of $3,000, and the contention of the prosecution is that it was nothing but a fraudulent scheme to have the appearance of a borrowing of money, so as to cover and conceal and give validity to the mortgage that was already of record; that is the government's theory.

"They rely further upon the testimony of Smoak that he has never foreclosed this mortgage; the mortgage was got from him by Mr. W. E. Free, one of the firm of Mayfield & Free, and that it was foreclosed, and the property sold under this mortgage, which the government contends, from the testimony, was simply an illusory or deceptive mortgage, and Smoak says that when the property was sold a check was brought to him by Mr. J. E. Spann, the son of the defendant (whether his own check or that of the Spann Mercantile Company he does not remember), for the $3,000, with something that he supposed was interest, making $3,252, that he declined to receive it, saying that he had never made any loan or deposit against his check, that he had never parted with any money, and that he refused to receive it, but it was arranged by this check that J. E. Spann presented him for $3,252 being really deposited to his account, but he gave J. E. Spann, or Spann Mercantile Company, another check for $3,252, which just balanced the other. So Smoak's testimony is that he never parted with any money on the loan; Smoak's testimony is that Spann never received any money from him on the loan, and that he never received any money from the proceeds of the sale. The theory of the prosecution therefore is that J. E. Spann, of the Spann Mercantile Company, received $3,250, the proceeds of the sale, approximately, on this mortgage, when really not a dollar had been paid out by Spann. In other words, that that $3,250 was turned over to J. A. Spann, or through him to the Spann Mercantile Company, without his ever having paid a dollar for it, or received a dollar for it, or executed a valid mortgage.

"Now that, gentlemen, is the theory of the prosecution, and if that theory were correct, why Spann would have executed and secured the benefit either to himself or to his son of $3,250 upon a fraudulent mortgage, if it was true; but we are not trying him on the question of a fraudulent mortgage. We are trying him upon the question whether or not he answered truly when he said that he had really paid out that $3,000 to the parties named under these dates in his examination, and his testimony he gave there, and the circumstances of the fraudulent mortgage and the truth of the deposit of these checks to the credit of Smoak, which offset his check, is material only as showing that his statements, that he had in reality paid his money to those people, that is a material statement; but this case stands or falls against him upon the question whether his explanation of the disposition of those checks to these parties was true or false. That is practically the whole of this case. Did he really in good faith pay these checks to the parties to whom they were payable, or did he simply take the checks and go to the bank and deposit them to the credit of Smoak, getting these parties to indorse them, so as to give countenance and appearance to the validity of the mortgage? Did he go to the bank and deposit them to the credit of Smoak, so as to offset the credit of $3,000? If he did not, he is not guilty; but I charge you, if he did take these checks, and procure them to be indorsed by the parties to whom they were payable, and carried them to the bank and deposited them to Smoak's account, so as to offset with these checks the debit on Smoak's account, by his check, and he was aware of it, and knew it, when he testified, then the jury would be justified in finding him guilty, and that is practically, gentlemen, the whole question.

"Now, on that point as to the indorsement of the checks, why, of course, the

checks, as to the persons who indorsed them, are very material pieces of testimony. Unfortunately they seem to have disappeared; but it is admitted that the parties named in this letter, to whom the checks were made payable, did indorse them. Therefore, under the testimony taken at this time, the jury would be justified in assuming that they were indorsed by those parties, although you have not the checks before you, so as to show you in whose handwriting the indorsements were, whether the check to Mayfield & Free, in whose handwriting that indorsement was, or the check to J. E. Spann, or the check to Mrs. Bloom, in whose handwriting that was. How far that may be material it is impossible to state at this time; the checks are not here, and all the jury, upon the testimony as to the matter of the checks, can deal with is that the checks were indorsed by those parties; that brings you then to the question whether the indorsement was secured by Spann for the purpose of enabling him to carry out his plan, not of paying them, but of apparently securing a loan from Smoak for $3,000 secured by a mortgage, depositing it to the credit of Smoak's account, so that he should owe Smoak nothing, and at the same time, protecting his property by a mortgage which really had no validity; if he did it, then his statements and answers to the interrogatories were untrue, and, if he knew they were untrue when he made them, then he would be guilty of perjury."

The first two counts relate to the transaction with Smoak, and, as we have stated, defendant was found guilty on these counts. It appears that evidence could not be produced as to the other counts, and therefore defendant was found not guilty as to them.

[1] It is insisted by the first assignment of error that the court below erred—

"in admitting parol and secondary evidence to prove the existence and pendency of a proceeding in court, upon which proceeding the indictment in this case is based, and in allowing witness to testify as to the contents of the said proceeding, when the record in said case was the direct and best evidence."

As respects this point it appears from the transcript of the evidence that:

"The prosecution first introduced, without objection, the stenographer's official notes of the testimony given by J. A. Spann, the defendant, on his examination before the Honorable Henry A. M. Smith, on the 3d March, 1916, in the supplementary proceedings in the case of Read Phosphate Company, plaintiff, v. J. A. Spann, defendant, as the same is fully set out in the indictment here."

There being no exception taken to the admission of this testimony upon which to base this assignment, as required by the rules, we deem it unnecessary to enter into further discussion of this point than to say that, if there had been exception thereto, we think the evidence in question is competent.

[2, 3] The second assignment of error relates to the ruling of the court in admitting the loose leaf ledger sheets of the People's Bank of Bamberg, showing the accounts of J. A. Spann and N. P. Smoak, without accounting for original entries or memoranda from which the ledger entries were made. The following statement is contained in the record as respects these entries:

"Q. Who made these entries. A. I did. Q. Have you the checks and deposit slips relative to those deposits and the checks? A. I have not; this record here shows that deposit slips and checks were returned to Mr. Spann that day. Q. Both deposit slips and checks? A. Yes, sir."

Both of the above ledger accounts offered in evidence by Mr. Waring.

Mr. Mayfield then objected to the introduction of same on the ground that they were irrelevant and immaterial. There is nothing whatever in the record to show that an objection was made at the time these slips were offered upon the grounds set forth in the assignment. In addition to this, it appears that the original memoranda pertaining to the defendant's account, consisting of checks and deposit slips, had been delivered to the defendant himself. Under these circumstances the court below very properly held that, the checks in question being in the possession of the defendant, it was impossible for the bank to produce them.

[4] By the third assignment it is insisted that the court below erred—

"in admitting the testimony of N. P. Smoak to the fact that no deposit in the bank was made by him to cover check drawn and given by him to J. A. Spann, on or about the 26th day of January, 1917."

We think this evidence was material to the issue then being tried, relating, as it did, to the transaction at the time the alleged mortgage was executed. In other words, it tended to show that the mortgage was not bona fide, and clearly intended as a means by which the defendant could elude his creditors and create the impression that his property was all covered by mortgage, while, according to this evidence, such was not the case.

[5] By the last assignment of error it is insisted that the judge erred in refusing to charge the jury that more weight was to be attached to direct testimony, when uncontradicted by an unimpeached witness, than to any inference to be drawn from facts and circumstances. It appears from the following statements that the judge clearly stated the law as respects the point to be raised by this assignment, and we think his ruling on this point was eminently proper and should be sustained.

"Mr. Mayfield: Upon the point that where there is positive testimony by a credible witness it overrides any deductions or reasonings to the contrary.
"Court: No, sir; I won't charge that, because you may not believe him.
"Mr. Mayfield: I say a credible witness.
"Court: I charge you that whether or not the positive testimony overrides is for the jury; it depends upon the credibility you give the witness; of course, if the jury believes him, it overrides, but whether you believe him or not is for you.
"(Mr. Mayfield excepts to this part of the charge.)
"Court: I charge you, gentlemen, and repeat it, there may be a thousand witnesses, who are positive; but if you think the circumstances show that their credibility is not good and you don't believe them, then you are not bound to believe them, any one of them or any part of them, and you are entitled in that case, according to the credibility which you extend to them, to override their credibility by the circumstances."

An examination of the proceedings in the court below, we think, clearly discloses the fact that the defendant deliberately entered into a scheme whereby he hoped to cover up his property with the alleged mortgage, which in reality had no foundation. It was evidently his purpose by this fraudulent scheme to create the impression upon his creditors that he had no property which could be reached by execution or other process, whereas in truth and fact his sole object was, without any consideration whatever being passed, to get his property into the

hands of his son, and thus deprive his creditors of that to which they were entitled. We think that the charge of the judge who heard this case was eminently fair. Upon such charge the jury has said they are satisfied beyond a reasonable doubt as to the guilt of the defendant, and we find no reason to disturb this verdict.

Therefore the judgment of the court below is affirmed.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes